May it please the Court, Matthew Green from Petitioner Hussain Abdul Al Zubaidy, who is not present, would like to reserve three minutes for rebuttal. In the proceedings below, the agency erroneously denied Mr. Al Zubaidy's application for a deferral of removal under the Convention Against Torture. It also erroneously found that he had been convicted of a particularly serious crime, and therefore ineligible for withholding of removal. As to the Convention Against Torture, or CAT, claim, both the Board of Immigration Appeals and the immigration judge failed to consider the aggregate risk of torture in the record. The implementing regulations to CAT require that all evidence relevant to the possibility of future torture shall be considered, and it must be considered. In the aggregate, this Court made that very clear in Coldfielder. The record and the immigration judge identified three sources of potential risk that Petitioner would be identified as a U.S. military collaborator and subject to detention torture. So those three specific risks, those three discrete pieces of evidence that gave rise to the identification of the risk was number one, that Mr. Al Zubaidy himself may divulge that he was a collaborator to insurgents or those who would inform insurgents. Number two, that Petitioner's family in Iraq may know and divulge that information to insurgents. And finally, number three, that insurgents or those sympathetic to insurgents know or will know that Mr. Al Zubaidy was a U.S. military collaborator based on the production of the military commercial in which he appeared. The immigration judge and the board affirmed the finding, mischaracterized Petitioner's case as merely a series of suppositions and speculation, labeling the sources of potential risk only as scenarios. In so doing, the agency failed to conduct the required analysis of the evidence in the aggregate and instead required multiple times Petitioner to establish... I thought I said yesterday's interview. Okay. Can I just insert it again? I'm sorry. It's not easy to follow somebody's reading. Okay. So, Judge, my point here is simply that what the immigration judge did and the BIA affirmed is that she required Mr. Al Zubaidy to establish a clear probability as to each source of that evidence. And that's there in the administrative record at page 33 and 94. There's actually four separate times where she laid out these potential risks. I'm trying to carry on. I just wanted to ask you guys. I think that I.J. cited various factors in determining that your client, his conviction for a racketeering conspiracy, was a particularly serious crime. That's what we're looking at, right? Well, we're looking at that. It sounds like your argument is because she did not make an adverse credibility determination and factored in some of those statements, there's a problem. Is that your argument? There's two arguments, Judge. The first is the particularly serious crime argument, simply that which is completely separate from the weight of the evidence. I thought you were predicting it. So help me understand exactly which argument. So, well, Judge, it's twofold. There's a particularly serious crime argument simply bifurcated from the rest of your catalogs. And you think that it's not a particularly serious crime? We think that it's not a particularly serious crime based on, number one, the evidence that was available in the record. And, number two, we think that it was a violation of, you think it was an abuse of discretion, and it was a violation of Mr. Altovedi's constitutional rights to find that it was a particularly serious crime. This is essentially what we described. This is catch-22. There's not an adverse credibility determination, but I'm going to go ahead and find one anyway, because what the analytical framework clearly required that Mr. Altovedi had an opportunity to explain the inconsistencies. Only one of the cited reasons involved for the particular serious crime, at least from my recollection, involved Mr. Sade's inconsistent testimony. I think that I.J. mentioned the fact that Mr. Altovedi contradicted himself, or contradicted his guilty plea to support I.J.'s finding that Altovedi did not accept responsibility for his crime. I think that's the only inconsistency that I could find, and I'm just wondering, if that factor was legal error, don't the remaining factors still support I.J.'s conclusion that Mr. Altovedi had been convicted of a particularly serious crime? Our position, of course, is that they do not. Can you respond to that? Sure. Well, Judge, essentially there are two rules of the analytical framework that controls that the immigration judge violated, and the first rule is that in the absence of explicit adverse credibility finding, an applicant's testimony should be considered true. It's the extreme rule, and that's the— But the problem here is, quite aside from whether, and I think this is what Judge McNeil was asking you, and quite aside from whether he contradicted when he said the plea colloquy, at the time of his conviction, he contradicted the conviction. I'm sorry, I didn't follow the question. He was convicted. Correct. His story is that he shouldn't have been convicted. He didn't commit the crime. That wasn't his story, Judge, with all due respect. What I believe his story was is that he wasn't challenging the validity of the conviction. He was explaining why—and his attorney was explaining why the judge should not find it— that he was never part of this conspiracy, even though it was found that he was. Right, but he was—well, he made it—he was very explicit. He said, I plead guilty because I plead guilty to save my life and the lives of my family. He was always being assassinated. He was explicitly finding that underlying the conviction that he was part of this conspiracy. He was— I mean, that wasn't true. He was absolutely saying that he was innocent, and he was not disputing that he pled guilty and that he had filed the conviction, because, again, we have a privacy issue. So what he was contradicting was not only what he said in the plea agreement, but defining—I'm just saying more fiction—but that he was in fact guilty because he's saying he wasn't guilty. I'll agree with that. So then that's—why isn't that a re-weighting of the factors? And this is a factual determination and not a legal review of what we're doing, because it seems like then that takes out of our purview. I don't think it does, because it's not—our position is that it's not a re-weighting of the evidence. How can you just respond, yes, I think that's what it was, and then this is not a re-weighting? I'm trying to answer your question as best as I can understand it, but, Judge, here's my point. I absolutely believe that the case law and the Constitution support the right of an individual in removal proceedings, whether it's particularly serious crime analysis or any other analysis— well, if I could finish, just so you know what I'm saying—to say, I pled guilty even though I was innocent. I do believe that there is an opportunity for, number one, an alien to say that, and number two, to explain why, especially within the context of particularly serious crime analysis. Well, I see what you're trying to say, but the question is, what's the consequence of particularly serious crime analysis? What the question is, the crime of which he was convicted. The conviction is, one, the conviction is a bygone conclusion in this case. Well, did he ever raise 2254?  Not to my knowledge. Let me ask you this. Look, what I read here, the hearing took place sometime in the beginning of May. Three weeks went by. The immigration judge wrote an extensive decision and realized that, wow, I guess he didn't ask him, you know, that question about, you know, whether he could explain as you wanted him to. But what else would he have said if she did not maybe inadvertently forget to ask that question? What else could he have asked? He already gave his reason. He already gave his rationale. If the IG is supposed to be a man of this value and give him another chance to say the same thing, what else could he have said? You know, he wasn't my client in rule. So I don't know the answer to your question. All I know, I'm just the unavailable world. Right. The world can respect this. But, you know, this is something I don't understand. Even if you prevailed on this, you'd still be in the same place on the withholding that you are on the torture issues, i.e., did he demonstrate that he was more likely than not to be persecuted, slashed, tortured? That's correct. Or still, the other question is, is he positive no matter what happens to this man? Well, and I was trying to explain there are two separate issues that I'm raising to appeal one particular serious crime that only deals with whether he's eligible for withholding. The other is the weight of the evidence and the error. He didn't. I mean, if he could demonstrate that he's more likely than not to be killed, tortured, or something when he gets back to Iraq, I mean, maybe he's better off withholding than he can, but not really. I mean, it's all the same thing. So the question is, I mean, I find the other interesting. The other issue, you know, also more potentially helpful and interesting. However, I'll give you some time to reflect on that. Thank you. Good morning, and may it please the Court. David Wetmore for the Attorney General. Touching just very briefly on the particular serious crime, I think Your Honor's recognized that's for what it is, and there is no legal outcome. Let's go to the other question. I mean, I think it seems to me that he has somewhat unusually strong evidence, given the general situation in Iraq as evidenced by the documents, and the fact that he wasn't attacked. He's all face in an answer which demonstrated that he was cooperating. He was basically helping the army. He wasn't interpreting, but he was helping. And the fact that there was at least some, that there was some evidence that some people in Iraq knew this, it seems oddly tough to say that they weren't going to, people weren't going to know about it, right? Because it was on a movie. Well, Your Honor, I would disagree with that, and first, as a threshold matter, that we need to make the clear distinction in the burden that the petitioner has for withholding under the INA, which is foreclosed because there is no jurisdiction, and the burden under CAD. CAD does require either direct government action, or it requires the government to exercise willful blindness. I'm sorry. Willful blindness is not a need. The government keeps saying that, but that's not our case. Or acquiescence. Or acquiescence. Or acquiescence. Why is acquiescence not the same thing? Well, in order to show either the petitioner does carry the burden to make a showing that he, in fact, in the general subjective petitioner's mind, that he actually will be tortured by somebody, either from the government, or that the government will look the other way and acquiesce to him being tortured by anybody. Now, when we run down the evidence here, it just simply doesn't hold up the commercial that reared outside of the United States. He testified that he was only aware that two people even ever saw this commercial. I don't know that it ever showed. That's all I can ask you. First of all, I don't know if there's any evidence of whether it's on the Internet, but everything's on the Internet, so I don't know if it is or isn't. I can't speak to that either, but, again, it's his burden to demonstrate that somebody would have seen it. The only thing that's on the record with regard to where it aired, we have testimony that two individuals, one person who worked in the military that was in the United States, saw this, and somebody else saw it on the Dubai network, which also aired within the United States. The commercial never aired after my contract. It was not allowed to air after July 8th of 2010. And the contract said that the commercial would not be shown. The terms of the contract were it could air between January 1st of 2009 and July 8th of 2010. To say anything else regarding whether it was on the Internet or somebody recorded it and could show it to people is pure speculation. I have a question. As you said, the timing of the link, sometimes there is a very limited type of involvement you had. One example was the commercial. The commercial, as it's explained in the testimony, was it showed some Iraqi, what appeared to be policemen or officers, some American personnel, and then it cuts to a frame. His face was on for approximately one minute, two separate times. After one second, you know, he doesn't identify himself. He doesn't say anything. It's just simply his face, which the immigration judge. It appeared, Your Honor, that they were casting for this commercial, and because he was doing work as a military contractor, he fit the bill. He signed up for it. He was paid for it. He signed a release for any potential damages. I think it was actually for the Army, so essentially he was an actor in the commercial. I believe the commercial was a recruitment to an effort to work with the Army. Right, but he wasn't identified in the commercial. It shows you twice for one second each. The commercial itself is only 20 seconds long, and there's no evidence whatsoever in the record that it was ever shown outside of the United States or that anybody, including his family in Iraq, anybody in Iraq, anybody in any position to potentially harm him, any government official in Iraq, ever saw this commercial, would ever act on this, or ever think even twice about it. Thank you. It was by contract. The commercial was allowed to air between January 1, 2009, and July 8, 2010. So that's there six years. Even if it was still airing at that time, and there's no evidence it aired outside of this country or that anybody even viewed it that would potentially harm him, made any threats regarding it, it's just, again, pure stringing together of a series of suppositions based on complete and total speculation. Sure, and I believe the agency did that. They looked at the commercial. They looked at his claim that I think the immigration judge did. The immigration judge very meticulously, as you pointed out, walked through each and every one of these factors, and it would sort of be strange to say that they were denying them, sort of chalk by chalk on each one and looking at it abstractly. I wouldn't think so. The board clearly looked at it and said, based on the totality of the information that we have here, the inconsistent testimony by the parents, whether they were even aware that he did this brief employment with this government contractor, whether the families would even care, whether they were supportive. It's just pure speculation. What he could have done to satisfy his aversion. Well, his father said that his family was never told and that his mother testified that her family was aware and that the father's family was also aware that he engaged in this behavior. The testimony was inconsistent, which went to weight, which again went to whether he could carry his burden to show more likely than not that government would torture him or that the government would acquiesce to his torturing situation. Again, there's nothing remotely definitive. It certainly doesn't rise to that high burden of more likely than not. It's, again, just supposition upon supposition. He could have obtained an expert to come in and testify regarding country conditions, regarding what this village was, regarding anything that had actually happened to anybody who was similarly situated to him, which he didn't do. Well, likely than not that his parents would acquiesce to anybody else and that my son was going back into the village. I absolutely agree, Your Honor. And the idea that he would just slip up and happen to tell somebody is also equally implausible. You know, he's shown he's apparently willing to commit perjury with regard to whether he's going to plead guilty and go serve 21 months in jail to avoid fatal harm occurring to him or other people. So it really stretches the imagination that he's not going to just run around telling some sort of militant or other Japan person that he, oh, by the way, I don't work for the U.S. military. Please go ahead and do terrible things to me or my extended family there. In addition to that, he has a truth that he could not reasonably relocate within Iraq. His father went there, traveled freely all over the country in 2010 using his Iraqi papers. Not so freely, but he did go there. He did, and he was unharmed. The petitioner has Iraqis, not a U.S. citizen, you can saw on there. He would enter Iraq on Iraqi papers, have Iraqi identification papers. He would have no official United States documents whatsoever that could be discovered by anybody. And he's fluent in Arabic. I mean, he's fluent enough in Arabic and Iraqi customs that our government hired him to teach our soldiers how to interact with Iraqi police and with Iraqis in general. In other words, he's an expert at being an Iraqi. He's a Shia. I don't know what it means to be a Shia. He's a Shia. That is absolutely true. He is a Shia. He has grown large, at least at the time of the hearing, large. That's why his style of hair is not even recognizable to the face that was in that commercial. He practices the religion, which is the dominant religion, religious sect within Iraq. The government is controlled by the Shia. It just, we really can't. There's nothing here that would allow him to carry that high burden that it's more likely that the government itself is co-religious, would seek him out and say, we're going to torture you, because years and years ago you worked for a government contractor in this limited capacity, only in the United States, because they don't even know about it. They're not going to find out about it, nor is anybody else. If the panel has no further questions, we'll submit them to Bruce. Thank you very much. Thank you. Your Honors, really the most one thing I could ask the Court to review before making a decision is pages 89 through 94 of the Administrative Record, and that is pages 22 through 27 of the Immigration Judge's decision. And I believe that it shows very clearly that there are two huge flaws and that this decision is lacking, number one, in any meaningful discussion of acquiescence. Obviously there's no discussion about Madrigal, but there's really no meaningful discussion of the law as it existed even before Madrigal. And in the last sentence of the last paragraph of the decision, the judge makes it clear that she was only focusing on whether the Iraqi government intends to torture Mr. al-Zubaydi, has no interest and no discussion whatsoever about acquiescence. Also on those pages, pages 93 and 94 of the record, it very clearly explains that she, that the Immigration Judge, exacted a standard that is impermissible requiring Mr. al-Zubaydi to show by a clear probability each one of the pieces of evidence instead of looking at it in the aggregate. So those are our main points. If there's any other questions, I'm happy to answer them. Thank you very much. Thank you both for your argument. I'm going to give the panel some time for some questions. And I think we are at recess. Thank you very much.
judges: Berzon, Murguia, Block